IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JIMMY R. BRADLEY,<br><br>                         Petitioner,<br><br>vs.<br><br>DAVE DAVEY, Warden,<br>California State Prison, Corcoran,[1]<br><br>                         Respondent. | No. 2:13-cv-01102-JKS<br><br>MEMORANDUM DECISION |

Jimmy R. Bradley, a state prisoner proceeding *pro se*, filed a Petition for a Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Bradley is in the custody of the

California Department of Corrections and Rehabilitation and incarcerated at California State

Prison, Corcoran.  Respondent has answered, and Bradley has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

On March 30, 2010, Bradley was charged with possession for sale of

methylenedioxymethamphetamine ("MDMA") (count 1) and possession for sale of marijuana

(count 2).  The information further alleged that Bradley had four prior strikes, one prior prison

term, and three prior drug convictions.  On direct appeal, the Court of Appeal described the

following facts underlying the charges against Bradley:

> On the afternoon of February 27, 2009, two undercover police officers observed
> [Bradley] and another man loitering inside an apartment complex and asked two
> uniformed officers to make contact with the two men.  The uniformed officers made
> contact one to two minutes later.  After observing that [Bradley] had his left hand in his
> left pocket, one of the officers asked [Bradley] to remove it.  When [Bradley] failed to
> respond, the officer asked him to state his name.  When [Bradley] again failed to respond,

[1]      Dave Davey is substituted for Connie Gipson as Warden, California State Prison,
Corcoran.  Fed. R. Civ. P. 25(d).

the officer asked [Bradley] "if he had anything illegal on him."  [Bradley] said he had "weed and E," which are common street names for marijuana and Ecstasy.  The officer searched [Bradley] and found a plastic bag containing 49 yellow pills and a plastic bag containing nine one–inch by one–inch baggies of what appeared to be marijuana in [Bradley's] right front pocket, and a cell phone in his pant pocket.  [Bradley] was placed under arrest.

Thereafter, the two undercover officers arrived at the scene.  After defendant was given and agreed to waive his *Miranda* rights, he told one of the undercover officers, "[T]here's just 20 something pills, and then however much marijuana.  It's possession for sale."  He also stated, "I'm out here just trying to get by.  What am I supposed to do for money?"

The uniformed officers drove [Bradley]to jail in their patrol car.  During the ride, [Bradley] stated generally that "he was out there to sell the pills, that he was selling them for $5 apiece, that it would take him anywhere from two to three days to sell the quantity that [the officers] recovered, and that he was doing so because he only worked part–time as a telemarketer, and that his rent was around $400."

It was later determined that the 49 pills possessed by [Bradley] were MDMA, and the nine small baggies contained a total of 3.15 grams of marijuana.

In addition, the cell phone found in [Bradley's] pocket contained recent outgoing text messages that appeared to relate to drug sales.  For example, one message read, "Yes, just wait.  You can buy your bag from me and I'm going to smoke one."  Another recent outgoing text message read, "I got E pills now, too."  There were also recent incoming text messages of a personal nature addressed to "Jimmy B."

*People v. Bradley*, No. C064726, 2012 WL 4788660, *2 (Cal. Ct. App. Oct. 9, 2012).

On April 6, 2010, a jury found Bradley guilty as charged and found true all of the allegations.  Throughout the course of his case, Bradley made a number of motions relating to his appointment of counsel.  He made four *Marsden*[2] motions requesting to substitute counsel, all of which the trial court denied; after which, he filed a *Faretta*[3] motion to represent himself, which the trial court granted.  Bradley subsequently moved for appointment of new counsel, and

---

[2]     *People v. Marsden*, 465 P.2d 44 (Cal. 1970) (holding it was error for the trial court to deny a defendant's motion to relieve his court-appointed attorney without holding a hearing to allow the defendant to explain its grounds).

[3]     *Faretta v. California*, 422 U.S. 806 (1975) (holding that a defendant in a state criminal trial has the constitutional right to refuse appointed counsel and represent himself when he does so voluntarily and intelligently).

the trial court responded that it would only re-appoint Bradley's initially-appointed counsel, which Bradley declined. Bradley then informed the court that he did not wish to be present during the remainder of the trial (he had then only attended jury selection) and therefore did not testify or appear after that point. The Court of Appeal described the procedural history of Bradley's case as follows:

### 1. July 10, 2009, *Marsden* Motion

On March 25, 2009, Clemente Jimenez was appointed to represent [Bradley]. On July 10, 2009, [Bradley] moved to relieve Jimenez and have new counsel appointed. [Bradley] complained that Jimenez was disrespectful and refused to listen; did not have time to work on his case; failed to investigate [Bradley's] proposed witnesses or have the drugs allegedly found on [Bradley] analyzed; failed to provide him with "paperwork" from his "strike review" or preliminary hearing; and told the prosecutor [Bradley] "would take anything but a life sentence." [Bradley] told the trial court this was "a simple drug case that might be a possession case, if [Jimenez] does his job correctly. Maybe I can get a drug program . . . ."

Jimenez responded that he had been in trial on another case for the past three and one half weeks and did not have time to work on [Bradley's] case during that time. Jimenez had drafted a *Romero*[4] motion seeking to vacate [Bradley's] prior strike convictions but had not yet filed it because he wanted to review reports concerning [Bradley's] prior convictions to determine if there were any mitigating factors. Jimenez had recently received those reports but had not had time to review them because he had been in trial. Jimenez characterized [Bradley's] expectations regarding the case as "unrealistic." Jimenez advised [Bradley] that given the severity of his prior convictions, it was unlikely the court would strike them. Jimenez also told [Bradley] that getting a drug program was not a realistic possibility. As for the paperwork [Bradley] requested, Jimenez explained that the strike review is an "informal process that the district attorney's office has" and that there is no paperwork. Jimenez also stated that he would be happy to provide [Bradley] with a copy of the preliminary hearing transcript if [Bradley] did not already have one. With respect to a possible resolution of the case, Jimenez explained that the prosecutor had sent him an email asking to "discuss resolution," and he responded, "My client will consider anything that doesn't involve 25 to life." In Jimenez's experience, deputy district attorneys, including the prosecutor in this case, generally lack the "authority to realistically negotiate," thus he did not take the message to mean much. Indeed, the prosecutor responded, "Yeah, it's 25 to life. It has to be." Jimenez did not believe that his relationship with [Bradley] had broken down such that he could not effectively assist [Bradley]. Rather, he stated that if [Bradley]"gives me an opportunity to do my job, I will do it."

FN4.   *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*).

The trial court denied the *Marsden* motion.  It found Jimenez had responded to most of [Bradley's] complaints, and while there was some dispute over tactics, such decisions rested with counsel.

### 2. October 13, 2009, *Marsden* Motion

Three months later, on October 13, 2009, [Bradley] again requested the court remove Jimenez and appoint new counsel.  [Bradley] complained that Jimenez waived time without [Bradley's] permission; had yet to file or provide him with a copy of the *Romero* motion; and had yet to interview [Bradley's] proposed witnesses "Michelle" and "Tiffany."  [Bradley] also claimed that Jimenez had provided him with conflicting information.  In particular, [Bradley] asserted that when he first met Jimenez, Jimenez told him, "I can get the marijuana case dismissed, but you're looking at . . . the [E]cstasy case doubled up, with a year prison prior.  That's the most you're looking at.  I can get the strike struck."  Later, however, he told [Bradley] he could no longer get him seven years.  Rather, he said [Bradley] was looking at 25 to life.

Jimenez responded that he had "thoroughly investigated this case to the extent that [he] believe[d] it's pertinent."  He explained that [Bradley] proposed witnesses were people whose texts, which were suggestive of drug transactions, were found on the cell phone recovered from [Bradley].  While Jimenez questioned whether they would make good witnesses, his investigator was attempting to locate them.  He also explained that the timing of the *Romero* motion was a strategic decision to be made by counsel.  As for the waiver of time, he stated that he never had the trial date reset or waived time without [Bradley's] consent.  Finally, with respect to a possible plea, he indicated that "the offer from day one in this case has been 25 to life," and that he had suggested to [Bradley] that a reasonable counter–offer would be to offer "to plead upper term to the charges . . ., if they are striking two of the strikes.  And then in addition to that, have them amend to include a three–year drug sale prior.  And that would get us approximately 11 or 12 years."  [Bradley] rejected this suggestion and instructed Jimenez to tell the prosecutor he would take a year in county jail and a drug program.  Although Jimenez believed that was "completely far–fetched and an impossibility," he did discuss it with the prosecutor.  Jimenez denied telling [Bradley] he could get him seven years.

The trial court denied the *Marsden* motion, concluding there was nothing to indicate Jimenez was ineffectively defending [Bradley], and that there were no irreconcilable differences that precluded Jimenez from effectively representing [Bradley].

### 3. November 9, 2009, *Marsden* Hearing

One month later, on November 9, 2009, [Bradley] again asked the court to remove Jimenez and appoint new counsel.  [Bradley] claimed Jimenez lied to the court during the first *Marsden* hearing by stating that [Bradley] had "sold drugs to an undercover officer" in an attempt to discredit him; waived time without [Bradley's] consent; refused to answer [Bradley's] questions; walked out of meetings with [Bradley]; had yet to file a *Romero* motion; drafted a *Romero* motion that omitted important facts; said it was not his job to determine whether the patrol car in which [Bradley] was alleged to have made various inculpatory statements contained any audio or video recording

devices; and asked [Bradley] to allow him to make a plea offer for something [Bradley] did not do.

Jimenez responded that the last few times he had spoken to [Bradley] they were unable to discuss anything of substance because [Bradley] spent the entire conversation complaining about what Jimenez had not done on [Bradley's] behalf. Jimenez denied telling the court [Bradley] sold drugs to an undercover agent. He had not yet filed the *Romero* motion for tactical reasons, explaining that "who hears the motion is very important." With respect to the possible existence of audio or video tapes, Jimenez explained that while he did not believe they existed, he had requested any such tapes and had not received anything in response. Jimenez believed [Bradley] was being "incredibly unreasonable about his situation" given [Bradley's] prior convictions and the fact he possessed [49] Ecstasy pills and a small amount of marijuana divided into individual baggies at the time of his arrest. Jimenez asked [Bradley] to waive time so that he could get the police reports concerning the prior convictions. Unfortunately, those reports showed that the prior convictions involved gangs and guns and contained no evidence of mitigation. Jimenez agreed that there had been an irremediable breakdown in communication insofar as he could no longer speak to [Bradley] about the case without [Bradley] complaining about his performance.

The trial court denied the Marsden motion. While it did not know whether there had been an irremediable breakdown in communication, it found that Jimenez had responded to [Bradley's] complaints, had not acted inappropriately, and had [Bradley's] best interests at heart. The court noted that there was no reason [Bradley] and Jimenez could not discuss what needed to be discussed, and to the extent there had been a breakdown in communication, the court suggested [Bradley] focus his conversations with Jimenez on the case and not on what he thought Jimenez should have done.

**4. March 30, 2010, *Marsden* Motion [and Subsequent *Faretta* Motion/Reverse-*Faretta* Motions]**

On March 30, 2010, the date trial was set to commence, [Bradley] again asked the court to remove Jimenez and appoint new counsel. [Bradley] complained that Jimenez failed to send an investigator to talk to witnesses who would testify that they got high with [Bradley] but that [Bradley] was not a drug seller; did not have a strategy for [Bradley's] case; and had yet to file a *Romero* motion or do anything to defend the case. [Bradley] also stated that he was not comfortable having Jimenez represent him and that he did not trust Jimenez.

Jimenez responded that one of [Bradley's] proposed witnesses was the individual who was with [Bradley] at the time of his arrest. Jimenez advised [Bradley] that he "did not believe that somebody else that was facing charges of possession or possession for sale of drugs would make a credible witness . . . ." Jimenez had repeatedly discussed his trial strategy with [Bradley] and advised [Bradley] that "[h]e's got a bad case. It is not a triable case . . . . I think this case should have been resolved for some type of determinate term." Assuming the case did go to trial, Jimenez's strategy was for [Bradley] to admit he possessed the drugs for personal use. He explained that if they were able to convince the jury that the drugs were solely for [Bradley's] personal use that

would lessen [Bradley's] exposure dramatically.  "That possession for sale of marijuana then turns into possession of less than an ounce of marijuana.  Nonissue for the strike purposes.  [¶]  The possession of [E]cstasy for sale then becomes a straight possession, which is a wobbler.  And at that point, we can request . . . the Court consider a [section] 17(b) motion."[5]

> FN5. Penal Code section 17, subdivision (b) allows the trial court to designate certain offenses misdemeanors rather than felonies.

Jimenez had filed a *Romero* motion with the trial court earlier that day.  As for [Bradley's] claim that Jimenez had done nothing to defend the case, Jimenez explained that in addition to the *Romero* motion, he had filed a *Pitchess*[6] motion, retrieved records concerning [Bradley's] prior convictions, and confirmed that there were no recording devices in the patrol car in which [Bradley] was alleged to have made inculpatory statements to police.  Jimenez felt he had done more than was necessary to prepare the case.

> FN6. *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

The trial court denied the *Marsden* motion, finding Jimenez appeared to be doing everything he could to effectively represent [Bradley] and that Jimenez and [Bradley] could work out their differences and continue to work together.  The court explained that it was Jimenez's job to provide [Bradley] with an honest assessment of the case and to advise a course of action, even if [Bradley] did not like it.

. . . .

On March 30, 2010, [Bradley] advised the trial court that he wished to represent himself, explaining that his "hands are . . . tied" given the court's denial of his *Marsden* motion.  The trial court cautioned [Bradley] against making what it termed "a significant decision" because he was "disappointed with the outcome of the *Marsden* motion."  The court advised [Bradley] that should it grant his motion, "we would still be on schedule to . . . go through the pretrial motions and [begin] jury selection on Thursday [April 1, 2010].  Do you understand that?"  [Bradley] said he understood.  The court then provided [Bradley] with a copy of the *Faretta* warnings for his review and signature.  [Bradley] indicated he had "[o]ne last question before I sign this" and asked, "I have to be ready by Thursday? [¶] . . . [¶]  I could not get a waiver—no time, maybe get a week to be prepared?"  The court again advised [Bradley] that it would not continue the trial, and [Bradley] said, "Okay.  Well, I'm still going pro per. . . ."  The court granted [Bradley's] request and "order[ed] that an investigator be assigned to [him] as well."  Jimenez advised the trial court that he would immediately turn over everything he had related to [Bradley's] case to the indigent defense panel.

After the court reconvened on April 1, 2010, [Bradley] complained that he "didn't get proper time to prepare for this . . . .  I'm being forced into trial without no [sic] type of preparation.  I still don't have my paperwork from the pro per officer.  I still don't have any type of defense."  The court reminded [Bradley], "I told you when you made

that decision [to represent yourself] that I would not continue the case, that we would be preceding to trial, and you said you wanted to represent yourself in any event." The court then announced that it would be in recess for 15 minutes while [Bradley] changed into civilian clothes and thereafter jury selection would commence.

When the court reconvened, it observed that [Bradley] had refused to change into civilian clothes and initially had refused to return to court. The court advised [Bradley] that "we are going forward with this trial . . . . If you tell me in the future that you don't want to come to court, we would continue the trial in your absence. [¶] . . . [¶] But I would appoint an attorney to be here and represent you, that would be Mr. Jimenez, if you are not going to join us for any of the proceedings. Do you understand that?" [Bradley] informed the court that he would no longer participate in the proceedings and refused to address the court. Thereafter, jury selection commenced.

Later that afternoon, [Bradley] again complained that he did not feel prepared for trial because, among other things, he had been denied access to an investigator and did not have certain pieces of evidence that he had provided to Jimenez. Sheila Ramos, the pro per coordinator, who was present in court, explained that [Bradley] had provided her with a list of items missing from his file, she had contacted Jimenez, and Jimenez would have the items ready for her to pick up that afternoon. She also explained that [Bradley] had provided her with a list of three witnesses and that she was attempting to secure them for [Bradley]. She had contact information for one of the witnesses, another was in state prison, and a third witness's phone had been disconnected. As to the person with the disconnected phone, [Bradley] told Ramos that he had an address for that witness with his belongings at the jail. Ramos said that if that person was local, she could serve him or her the following day. When [Bradley] complained that he did not have all the police reports and investigation in his case, the coordinator stated that she had been given the entire case file and offered to copy the reports and provide them to [Bradley] before the presentation of evidence the following week. When [Bradley] responded that he nevertheless did not feel "like [he'd] had the proper amount of time to do anything," the court asked how much time he was asking for. He said he did not know.

The trial court declined to continue the trial. It observed, "I have asked you to tell me how much time you need and you have said that you don't really know. I'm not inclined to give you a continuance for an indefinite period of time." It further observed that "it sounds to me like the investigator that has been assigned to work with you, Miss Ramos, has made sure [you] will get the necessary folks here . . . if they are able to. Sounds like that can be done in relatively short order, so I don't really see a need for the continuance." At that point, [Bradley] asked to be excused from the proceedings, and the court granted his request.

The following day [Bradley] filed a reverse–*Faretta* motion, seeking the appointment of "new counsel." The trial court advised [Bradley] that it was willing to reappoint Jimenez, explaining that "we've had a *Marsden* motion. You're not entitled to new counsel." [Bradley] indicated he would not "accept [ ]" Jimenez, and the trial court denied his request for new counsel. After the trial court denied or struck several other motions filed by [Bradley], [Bradley] indicated that he did not wish to be present and elected not to be present for the remainder of the trial.

7

After the jury rendered its verdict, [Bradley] brought a series of motions requesting the appointment of counsel to assist him with his *Romero* motion and at the judgment and sentencing phase of the proceedings.  The trial court denied [Bradley's] initial request as untimely but four days later indicated it was willing to reappoint Jimenez to assist him.  [Bradley] again stated that he would not accept Jimenez because his prior representation was ineffective.  The trial court explained that it had already determined that Jimenez was "not ineffective" when it denied [Bradley's] *Marsden* motions.  Thereafter, [Bradley] indicated he wished to remain pro per, and the trial court denied his request for counsel.

. . . .

**[5. Motion for the Appointment of an Investigator]**

On March 30, 2010, the trial court granted [Bradley's] *Faretta* motion and "order[ed] that an investigator be assigned . . .."  On April 1, 2010, the next court day, the trial court stated that "the pro per coordinator, Miss Ramos, . . . has indicated to me that [Bradley] would like to address the Court."  [Bradley] complained that he was not prepared to proceed because, among other things, he "never had a chance to any access to . . . an investigator . . . ."  The trial court responded, "You have been appointed an investigator.  Miss Ramos is here from the pro per coordinator, who is the person that coordinates the investigator assigned to your case."  The court also indicated that it had been advised that [Bradley] had provided Ramos with a list of proposed witnesses, and that she was attempting to secure those witnesses for him.  The trial court declined to continue the trial, explaining that "it sounds to me like the investigator that has been assigned to work with you, Miss Ramos, has made sure [you] will get the necessary folks here . . . if they are able to."

After the prosecution rested, the court considered how to proceed in [Bradley's] absence.  The court confirmed that [Bradley] had provided Ramos with the names of three witnesses, and Ramos detailed her efforts to secure those witnesses.  One of the witnesses was in St. Louis and was not willing to appear at [Bradley's] trial.  The telephone for another witness had been disconnected, and [Bradley] had not provided Ramos with an address for that witness.  The third, Mr. Fletcher, was serving a 19 year and four month prison term at Deuel Vocational Institution in Tracy.  Ramos indicated that [Bradley] wanted to call Fletcher for two reasons: "One is to say that the cell phone was not [Bradley's], nor was it the witness's.  It would be another party's phone.  [¶] And that he would also say that the items [Bradley] possessed were not possessed for sale."  According to [Bradley], Fletcher knew these things because he was present when [Bradley] was arrested.  Ramos informed the court that she had advised [Bradley] that she "could not present the witness for him" at trial, and [Bradley] still refused to come to trial.  Hearing that, the trial court found it would be futile to make any further attempts to secure Fletcher, a state prisoner, if [Bradley], who was representing himself, was unwilling to come to court and participate in his defense.

After the jury rendered its verdict, [Bradley] filed numerous motions, including a motion for an investigator to be appointed to investigate "mitigating circumstances prior to sentencing."  At the hearing on the motion, [Bradley] complained that while the court appointed Ramos to facilitate [Bradley] getting an investigator, "she decided to do all the

8

investigative work on her own."  Because Ramos was not an investigator, [Bradley]
claimed he had been denied an investigator despite his numerous requests for one and
had not "had a chance to do anything . . . [to] challenge this judgment and sentencing."
[Bradley] claimed that he provided Ramos with a written request for an investigator on
April 24, 2010, and verbally advised her at that time that he wanted the investigator to
contact his boss and family members to speak for him at his sentencing hearing.

 Ramos, who was present at the hearing, explained that her job was "to receive the
information regarding [the] pro per, evaluate his case, and determine what, in fact, needs
to be done on his case.  That includes hiring an investigator when it's necessary; making
sure subpoenas are written correctly and are issued, . . . and that they are served . . . ."
She explained that [Bradley's] case was unusual in that she did not receive it until after
trial had commenced.  She received [Bradley] case on April 1, 2010, met with him that
same day, and provided him with a copy of the procedures for obtaining investigative
services.  That same day, [Bradley] provided her with a written request indicating that he
wanted some paperwork from Jimenez and three witnesses subpoenaed.  Ramos
contacted Jimenez and requested the documents [Bradley] wanted.  Because trial had
begun and because she felt time was of the essence, Ramos did not require [Bradley] to
write out his own subpoenas.  Rather, she attempted to contact the witnesses to get
addresses to subpoena them.  According to Ramos, [Bradley] never submitted any
request of an investigative nature despite being advised verbally and in writing that an
investigator would not be hired unless he specified what investigations he would like to
have done.  In fact, on May 17, 2010, after receiving [Bradley's] motion for an
investigator to be appointed, Ramos wrote to [Bradley] and advised him that she had
received his motion for appointment of an investigator.  That she would be happy to hire
an investigator for him as soon as she received a request for services that required an
investigator."  She further advised [Bradley] that she would be at the jail on May 24,
2010, "to pick up [Bradley's] requests so that I could have them completed, if it
were—needed an investigator by his sentencing date of . . . . [June] 11th."  [Bradley] had
nothing for her on May 24. Ramos further advised the court that she never informed
[Bradley] that she was his investigator, and that "[t]here has been nothing that he has
requested that he has not received."

 The trial court denied [Bradley's] motion for appointment of an investigator,
finding [Bradley] had ample opportunity to have an investigation done both during the
pendency of the trial and in the weeks leading up to sentencing.  The court observed that
[Bradley] had notice of the procedures necessary to secure an investigator but failed to
utilize them.  To the extent Ramos' version of events differed from [Bradley's] version,
the court credited Ramos.

*Bradley*, 2012 WL 4788660, at *2-12.

On June 11, 2010, the trial court sentenced Bradley to 25 years to life imprisonment on

count 1, plus a consecutive 10 years' term (3 years for each of the three drug prior enhancements

plus a consecutive year for the prison term prior).  The court also sentenced Bradley to a concurrent term of 25 years to life on count 2.

Through counsel, Bradley appealed his conviction, arguing that the trial court: 1) abused its discretion by denying Bradley's four *Marsden* motions; 2) abused its discretion by granting Bradley's *Faretta* motion and denying his post-*Faretta* motion for new counsel; 3) denied Bradley effective legal assistance by failing to appoint an investigator to interview Bradley's potential witnesses; 4) violated Bradley's right to be present at trial by proceeding in his absence; and 5) committed cumulative error that warranted reversal of Bradley's conviction.  On October 9, 2012, the Court of Appeal issued a reasoned, unpublished opinion affirming Bradley's judgment in its entirety.  *Bradley*, 2012 WL 4788660, at *15.

While Bradley's direct appeal was pending, he filed in the state courts a number of *pro se* habeas petitions.  He first raised his direct appeal claims in a *pro se* petition for a writ of habeas corpus in superior court.  The superior court denied the petition on procedural grounds on April 29, 2010.  Shortly after that denial, Bradley filed another *pro se* habeas petition in superior court challenging the strike priors he claimed to have been imposed.  The superior court likewise denied this petition on June 10, 2010, noting that final judgment had not yet been affirmed, and Bradley had not been sentenced.  He then raised his direct appeal claims in a *pro se* habeas petition in the Court of Appeal, which was summarily denied on May 12, 2011.  He then filed another *pro se* habeas petition in the Court of Appeal, arguing that his trial counsel rendered ineffective assistance for refusing to investigate potential witnesses.  That petition was also denied without comment on August 25, 2011.

Bradley timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on May
30, 2013.

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Bradley raises four grounds for relief.  First,
Bradley contends that the trial court violated his due process rights when it granted his *Faretta*
motion and allowed him to represent himself.  Likewise, he argues that his right to counsel was
violated when the trial court did not re-appoint Jimenez to represent Bradley after Bradley chose
not to return to court.  Third, Bradley alleges that his rights to counsel and a fair trial were
violated by the trial court's failure to appoint an investigator.  Finally, Bradley argues that the
trial court violated his right to be present at trial when it conducted the trial in his absence.
Bradley also requests an evidentiary hearing as to all claims.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.
§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or
involved an unreasonable application of, clearly established Federal law, as determined by the
Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable
determination of the facts in light of the evidence presented in the State court proceeding,"
§ 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that
contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that
are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives
at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1)

"refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the

relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where

holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"

*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are

beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S.

Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was

correctly applied). It is a fundamental precept of dual federalism that the states possess primary

authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62,

67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and

application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state

court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536

U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned

decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004)

(citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). "Where there has been one reasoned

state judgment rejecting a federal claim, later unexplained orders upholding the judgment or

rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803

(1991).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless

the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1);

*Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

A.      *Faretta* Motion

Bradley first argues that "[t]he trial court abused its discretion by granting [his] *Faretta*

request and improperly den[ying] his motion for a one-week continuance."

As an initial matter, to the extent that Bradley argues here that the trial court abused its

discretion, such claim is not cognizable on habeas review.  Although the Ninth Circuit has

suggested that an abuse of discretion may also amount to a constitutional violation, *see Schell v.*

*Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc), the Supreme Court has never held that

abuse of discretion is an appropriate basis for granting federal habeas relief.[4]  Indeed, quite to the

contrary, the Supreme Court has strongly suggested that, while abuse of discretion is an

appropriate standard on direct review, in a federal habeas proceeding it is not.  *Renico v. Lett*,

559 U.S. 766, 772-73 (2010) ("It is not even whether it was an abuse of discretion for her to have

done so–the applicable standard on direct review.  The question under the AEDPA is instead

whether the determination of the Michigan Supreme Court that there was no abuse of discretion

---

[4]        At one time, the Ninth Circuit viewed a state court ruling to be "objectively
unreasonable" if it amounted to a clear error.  *Van Tran v. Lindsey*, 212 F.3d 1143, 1152-54 (9th
Cir. 2000).  This is the test the Ninth Circuit uses in reviewing a trial court decision under the
abuse of discretion standard.  *United States v. Ressam*, 679 F.3d 1069, 1086 (9th Cir. 2012) (en
banc).  The Supreme Court noted *Van Tran's* statement of the test and expressly rejected it as
inappropriate under the AEDPA.  *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (clear error
standard is insufficiently deferential to state courts).

was "an unreasonable application of . . . clearly established Federal law." (quoting

§ 2254(d)(1))).

Nor can this Court find unreasonable or contrary to federal law the trial court's allowing

Bradley to represent himself.  The right to counsel guaranteed by the Sixth Amendment "has

been interpreted to encompass 'an independent constitutional right' of the accused to represent

himself at trial, and thus waive the right to counsel." *Stenson v. Lambert*, 504 F.3d 873, 882 (9th

Cir. 2007) (quoting *Faretta*, 422 U.S. at 806).  Such waiver, however, must be "knowing,

voluntary, and intelligent." *Iowa v. Tovar*, 541 U.S. 77, 87-88 (2004).  While no specific

colloquy is required, *Lopez v. Thompson*, 202 F.3d 1110, 1117 (9th Cir. 2000) (en banc), the

Ninth Circuit has "gleaned a three-factor test from *Faretta*, under which in order to deem a

defendant's *Faretta* waiver knowing and intelligent, the district court must insure that he

understands 1) the nature of the charges against him, 2) the possible penalties, and 3) the dangers

and disadvantages of self-representation," *United States v. Forrester*, 512 F.3d 500, 506 (9th Cir.

2008) (citation and internal quotation marks and brackets omitted).  "The preferred procedure to

ensure that a waiver is knowingly and intelligently made is for the district court to discuss each

of the three elements with the defendant in open court," although a trial court's failure to do so

"will not necessitate automatic reversal when the record as a whole reveals a knowing and

intelligent waiver." *United States v. Balough*, 820 F.2d 1485, 1488 (9th Cir. 1987).

In his Petition, Bradley does not argue that his *Faretta* waiver was unknowingly made,

and as the Court of Appeal noted, the record provides no support for such assertion.  *See*

*Bradley*, 2012 WL 4788660, at *8.  Rather, he claims that the trial court "coerced" him into

representing himself by denying his *Marsden* motions and ruling that it would only appoint

14

Bradley's original attorney.  But "there is no authority for the proposition that [a defendant] is

entitled to an absolutely unconditional choice between exercising his right to counsel and his

right to self-representation."  *United States v. Robinson*, 913 F.2d 712, 715 (9th Cir. 1990).  In

*Robinson*, the Ninth Circuit addressed a defendant's argument on direct appeal of his conviction

that he was coerced into self-representation "as a result of . . . being faced with the implicit

choice of retaining [an] attorney . . ., with whom he had apparently had some tactical and

strategy disagreements, and proceeding pro se."[5]  *Id.* at 715-16.  The Ninth Circuit concluded

that "limitations on the range of a defendant's free choice with regard to appointed or retained

---

[5]      The Sixth Amendment right to counsel guarantees to an accused the concomitant rights to conflict-free representation and the effective assistance of counsel.  *See Wheat v. United States*, 486 U.S. 153, 156 (1988); *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  These rights may be infringed if an accused and his counsel become embroiled in an "irreconcilable conflict."  *See Stenson v. Lambert*, 504 F.3d 873, 886 (9th Cir. 2007) ("[F]orcing a defendant to go to trial with an attorney with whom he has an irreconcilable conflict amounts to constructive denial of the Sixth Amendment right to counsel." (citing *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970) ("[T]o compel one charged with [a] grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever.")); *see also Daniels v. Woodford*, 428 F.3d 1181, 1197 (9th Cir. 2005).

However, "not every conflict or disagreement between the defendant and counsel implicates Sixth Amendment rights."  *Schell v. Witek*, 218 F.3d 1017, 1027 (9th Cir. 2000) (en banc) (citing *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983)).  The Sixth Amendment does not require or guarantee, implicitly or otherwise, that an attorney-client relationship be "meaningful" or free of discord.  *Morris*, 461 U.S. at 13-14; *see Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th Cir. 2008) (en banc) ("[Petitioner] has cited no Supreme Court case—and we are not aware of any—that stands for the proposition that the Sixth Amendment is violated when a defendant is represented by a lawyer free of actual conflicts, but with whom the defendant refuses to cooperate because of dislike or distrust.").  Rather, an asserted conflict crosses the constitutional threshold "only where there is a complete breakdown in communication between the attorney and client, and the breakdown prevents effective assistance of counsel."  *Stenson*, 504 F.3d at 886 (citing *Schell*, 218 F.3d at 1026); *see also Daniels*, 428 F.3d at 1197 (the nature and extent of the conflict must be such as to "deprive[] the defendant of representation guaranteed by the Sixth Amendment." (citing *Schell*, 218 F.3d at 1027)).

counsel are not constitutionally offensive and do not render a subsequent election of pro se status involuntary." *Id.* at 716.

The Ninth Circuit has made an exception in the case of incompetent counsel. *See Schell v. Witek*, 218 F.3d 1017, 1026 (9th Cir. 2000) (reasoning that, where a defendant is left with the choice of only incompetent counsel, he is "improperly left with no counsel at all"). In *Schell*, the Ninth Circuit remanded to the district court for an evidentiary hearing because "*no* court, either state or federal, ha[d] ever adequately looked into the merits of the substance of [the petitioner's] serious allegations." *Id.* at 1027. An evidentiary hearing is inappropriate here, however, because the record reflects that, after each *Marsden* motion, the trial court allowed Bradley an opportunity to address his concerns, and considered those arguments and counsel's response before concluding that counsel was effective. The state court's finding was reasonable and fully consistent with the record. Thus, because Bradley does not argue that the trial court erred in denying his *Marsden* motions to substitute counsel for Jimenez and, indeed, the record does not demonstrate such error,[6] Bradley cannot show that the trial court's limitation of counsel to Jimenez rendered his waiver of the right to counsel involuntary.

Nor can Bradley show that his due process rights were violated by the trial court's refusal to grant him a continuance. The matter of continuance falls within the discretion of the trial

---

[6]     The Court of Appeal took the view that the erroneous denial of a *Marsden* motion is subject to harmless error review. *Bradley*, 2012 WL 4788660, at *6. Because no *Marsden* error occurred here, this Court is not required to answer that question in this case. The Ninth Circuit has held, however, that the erroneous denial of a *Marsden* motion constitutes structural error if a full inquiry into counsel's competence and the relationship between the defendant and his attorney reveals either that the defendant was forced to choose between incompetent counsel and no counsel at all, or the conflict between the defendant and his attorney actually prevented effective assistance of counsel. *Schell*, 218 F.3d at 1026-27.

judge. *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). "Trial judges necessarily require a great deal of latitude in scheduling trials" due to the problems associated with assembling witnesses, lawyers and jurors. *Morris v. Slappy*, 461 U.S. 1, 11 (1983); *United States v. Garrett*, 179 F.3d 1143, 1145 (9th Cir. 1999). A petitioner alleging he was denied the right to assistance of counsel due to the court's denial of a continuance must demonstrate "an unreasoning and arbitrary 'insistence upon . . . expeditiousness in the face of a justifiable request for delay.'" *Morris*, 461 U.S. at 11-12 (quoting *Ungar*, 376 U.S. at 589). In evaluating decisions denying continuances, reviewing courts must pay particular attention to the reasons presented to the trial judge in support of the request for continuance. *Ungar*, 376 U.S. at 589. The denial of a continuance will result in habeas corpus relief only if petitioner can show that he actually suffered prejudice as the result of the denial of a continuance. *Gallego v. McDaniel*, 124 F.3d 1065, 1072 (9th Cir. 1997).

In this case, petitioner fails to demonstrate that he suffered prejudice as a result of the denial of the continuance. Although he states in his Petition that he asked for a one-week continuance, the record reflects that he told the trial court he did not know how much time he needed and did not identify what he would do during that period to prepare for trial. When he complained that material was missing from his file and that he needed to speak with certain witnesses, the pro per coordinator explained that she would pick up the missing information that afternoon, had contacted the identified witnesses whom she could find, and would be contacting the last witness when she received an address from Bradley. The trial judge reasonably concluded that the requested information could be obtained in short order before the start of Bradley's case-in-chief. This record thus reveals that Bradley had an opportunity to present his case, and to do so with the assistance of a pro per coordinator. When petitioner was unable to

offer the trial court any material reason why his case might be prejudiced in the absence of a continuance, he placed the judge in a difficult position by moving to proceed *pro se* on the morning set for trial.  While the Court takes seriously the fact that the trial court required Bradley to proceed to trial just two days after he elected to proceed *pro se*, given the absence of any showing of prejudice and that the trial court warned Bradley that he would not be granted a continuance prior to accepting his self-representation request, the trial court's refusal to allow a continuance did not arise to the level of a due process violation.  Bradley is therefore not entitled to relief on this ground.

B.      Failure to Re-Appoint Jimenez

Bradley likewise contends that his right to counsel was violated when the trial court failed to re-appoint Jimenez to represent Bradley in his absence.  The Court of Appeal rejected the claim as follows:

> Generally speaking, "the *involuntary* exclusion from the courtroom of a defendant who was representing himself, without other defense counsel present," constitutes error. (*People v. Carroll* (1983) 140 Cal. App. 3d 135, 142, italics added; *see also People v. Soukomlane* (2008) 162 Cal.App.4th 214, 234–235.)  On the other hand, in non–capital cases, where a defendant voluntarily absences himself from trial, the court is free to continue with the trial without appointing defendant counsel.  (*See People v. Parento* (1991) 235 Cal.App.3d 1378, 1381–1382.)  "'The choice of self–representation preserves for the defendant the option of conducting his defense by nonparticipation. [Citation.]  A competent defendant has a right to choose "simply not to oppose the prosecution's case."'" [Citation.]" (*Id.* at p. 1381.)
>
> Here, [Bradley] was never involuntarily excluded from the courtroom.  Rather, he chose not to attend trial, despite being given every opportunity to return.  As former Presiding Justice Robert K. Puglia observed, "Respect for the dignity and autonomy of the individual is a value universally celebrated in free societies and uniformly repressed in totalitarian and authoritarian societies.  Out of fidelity to that value defendant's choice must be honored even if he opts foolishly to go to hell in a handbasket.  At least, if the worst happens, he can descend to the netherworld with his head held high.  It's called, 'Doing It My Way.'" (*People v. Nauton* (1994) 29 Cal. App. 4th 976, 981.)  [Bradley's] way, in effect, was to default by walking out of the trial.  [Bradley] cannot now fault the trial court for honoring his voluntary choices about self–representation.

> To the extent [Bradley] suggests that the trial court's admonition that it would appoint Jimenez "to be here and represent you . . . if you are not going to join us for any of the proceedings," somehow gave rise to a right to have Jimenez appointed, he is mistaken.  The trial court made this statement before [Bradley] advised the court that he would not "accept" Jimenez when the court indicated it was willing to reappoint him when [Bradley] moved to withdraw his *Faretta* waiver and have new counsel appointed.  Moreover, the trial court's admonition was contingent upon [Bradley] failing to attend "any of the proceedings."  As discussed below in section IV, [Bradley] was present for a portion of the proceedings, namely the commencement of jury selection.  Accordingly, the trial court was under no obligation to reappoint Jimenez or any other attorney to represent [Bradley] after he voluntarily chose to absent himself from the proceedings.

*Bradley*, 2012 WL 4788660, at *10-11.

In *John-Charles v. California*, 646 F.3d 1243, 1245-46 (9th Cir. 2011), the Ninth Circuit considered whether a petitioner's right to counsel was violated when a California state trial court denied the petitioner's request to re-appoint trial counsel when he changed his mind about representing himself because "he was bewildered by the jury selection process and motions arguments."  The Ninth Circuit ultimately rejected the petitioner's claim that he was constitutionally entitled to the reappointment of counsel, finding that the Supreme Court has not "directly address[ed] whether and under what conditions a defendant who validly waives his right to counsel has a Sixth Amendment right to reassert it later in the same stage of his criminal trial."  *Id.* at 1248-49.

In *Marshall v. Rodgers*, 133 S. Ct. 1446, 1449-51 (2013), the Supreme Court confirmed the Ninth Circuit's conclusion in *John-Charles* that it is an open question whether a defendant has a constitutional right to have counsel reappointed following a valid *Faretta* waiver.  In *Rodgers*, the Court noted the "tension" between the Sixth Amendment's guarantee of representation and the "concurrent" constitutional right to waive representation.  *Id.* at 1450-51.  The Court held that the approach of California courts–which vest the trial judge with discretion

when considering post-waiver request for reappointment of counsel to either grant or deny them based on a totality of the circumstances–"cannot be said" to be contrary to or an unreasonable application of Supreme Court precedent.  *Id.*

In this case, the California Court of Appeal's conclusion that the trial court had discretion to grant or deny a subsequent request to reappoint counsel and that such decision is reviewed based on the totality of the circumstances is wholly consistent with *Rodgers*.  It is well-established that a state court's decision adjudicating an issue cannot be contrary to, or an unreasonable application of, Supreme Court precedent if the Supreme Court has not yet decided the issue.  *See Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam); *Carey*, 549 U.S. at 77; *see also Crater v. Galaza*, 491 F.3d 1119, 1123 (9th Cir. 2007).  Consequently, Bradley is not entitled to relief on his second claim either.

C.      Request for Investigator

Bradley additionally claims that the trial court violated his right to counsel by failing to appoint an investigator and "committed misconduct by acting in concert with the pro per coordinator to mislead . . . petitioner regarding this failure."  The Court of Appeal rejected the claim on direct appeal, concluding:

> Here, the trial court reasonably could conclude, as it did, that [Bradley] was aware that an investigator would be hired only if he specified the nature of the investigation to be performed, yet he failed to provide such information.  It also could reasonably conclude that the requests he did make were carried out.
> We reject [Bradley's] assertion that the trial court engaged in misconduct by attempting to mislead [Bradley] that Ramos was his investigator.  While the trial court mistakenly referred to Ramos as an investigator on a couple of occasions, it is clear from the record that Ramos was the pro per coordinator and that her job was to coordinate the provision of ancillary services, including the assignment of an investigator, where necessary.

*Bradley*, 2012 WL 4788660, at *13.

20

Bradley fares no better on federal habeas review.  The Ninth Circuit has held that the Sixth Amendment right to self-representation does not includes "further rights to materials, facilities, or investigative or educational resources that might aid self-representation."  *United States v. Wilson*, 690 F.2d 1267, 1271 (9th Cir. 1982).  The United States Supreme Court has also stated that "*Faretta* says nothing about any specific legal aid that the State owes a *pro se* criminal defendant."  *Kane v. Garcia-Espitia*, 546 U.S. 9, 10 (2006).  Thus, there is no clearly-established Supreme Court authority requiring that an indigent *pro se* defendant be afforded the assistance of an investigator.

And while the Ninth Circuit later held that, in "appropriate circumstances, a court must provide an investigator to effectuate a defendant's right to the effective assistance of counsel," that court recognized that the appointment of an investigator is "constitutionally necessary" only when such services are "required."  *Williams v. Stewart*, 441 F.3d 1030, 1053 (9th Cir. 2006).  As the Court of Appeal held, the trial court reasonably concluded that further services were not required because Bradley did not fulfill the requirements of procuring such services and his initial requests had been carried out.[7]  *See Bradley*, 2012 WL 4788660, at *13.  Again, the Court notes that the trial court allowed Bradley an opportunity to discuss his need for investigative services and also considered the pro per coordinator's response.  To the extent their accounts differed, the trial court credited the coordinator.  This Court is precluded from revisiting such credibility determinations.  *See Bruce v. Terhune*, 376 F.3d 950, 957-58 (9th Cir. 2004).

---

[7]     Indeed, even if the services Bradley later sought were "required" under *Williams*, Bradley still could not prevail because habeas relief is only available where the state court decision is contrary to U.S. Supreme Court precedent, not circuit precedent.  *See Marshall*, 133 S. Ct. at 1450-51.

Moreover, even if the trial court erred in failing to afford Bradley the requested

investigative services, Bradley cannot show that the error was anything more than harmless.  *See*

*Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993) (laying out the Supreme Court's requirement

that habeas relief be granted only when an error has a "substantial and injurious effect").  As the

Court of Appeal concluded in the alternative:

> Finally, as detailed above, any possible error was harmless under any standard given the overwhelming evidence indicating [Bradley] possessed the MDMA and marijuana for sale.  Contrary to [Bradley's] assertion, the question of cell phone ownership was not "crucial."  Even assuming the cell phone was not owned by [Bradley], as Fletcher purportedly would have testified, the evidence showed that it contained incoming text messages addressed to "Jimmy B."  Accordingly, Fletcher's proffered testimony, even if believed, would have done little, if anything, to undercut the prosecution's case.  In any event, even without the evidence obtained from the cell phone, the evidence against [Bradley] was overwhelming and any error arising from the trial court's failure to appoint an investigator was harmless beyond a reasonable doubt.

*Bradley*, 2012 WL 4788660, at *13.

Bradley is therefore not entitled to relief on this ground.

D.       Trial in Absentia

Finally, Bradley argues that the trial court violated his right to be present at trial when it

continued the trial in his absence.

Under the Due Process Clause, a criminal defendant has a right to be present at any stage

of the criminal proceeding that is critical to its outcome if his presence would contribute to the

fairness or reliability of the procedure.  *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987); *United*

*States v. Gagnon*, 470 U.S. 522, 526-27 (1985) (per curiam).  A defendant must be allowed to be

present "to the extent that a fair and just hearing would be thwarted by his absence."  *Stincer*,

482 U.S. at 745 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 108 (1934)).  However, "th[e]

privilege of presence is not guaranteed 'when presence would be useless, or the benefit but a

22

shadow.'"  *Stincer*, 482 U.S. at 745 (quoting *Snyder*, 291 U.S. at 106-07); *see also Gagnon*, 470

U.S. at 527 (defendants' absence did not violate the Due Process Clause where their presence

was not needed to "ensure fundamental fairness" and they could not have added to or gained

from being present at the conference).

　　　　Moreover, the right to be present at every stage of his trial may be waived by a defendant

who voluntarily absents himself from trial.  *See Taylor v. United States*, 414 U.S. 17, 18-20

(1973) (per curiam); *Diaz v. United States*, 223 U.S. 442, 455 (1912); *Brewer v. Raines*, 670

F.2d 117, 119 (9th Cir. 1982) ("When, after sufficient notice, a defendant voluntarily absents

himself from any proceeding, he waives any right he has to be present at that proceeding.").

Other courts have allowed waiver of appearance even where the defendant is proceeding *pro se*.

*See Thomas v. Carroll*, 581 F.3d 118, 126-27 (3d Cir. 2009), *cert. denied*, 130 S. Ct. 3462 (2010)

(state court's conclusion that defendant's Sixth Amendment rights were not violated when the

trial court conducted defendant's trial without anyone present for the defense after defendant

elected to represent himself and then voluntarily absented himself from trial to protest the trial

court's rulings was not contrary to, or an unreasonable application of, clearly established federal

law); *Clark v. Perez*, 510 F.3d 382, 396 (2d Cir. 2008), *cert. denied*, 555 U.S. 823 (2008)

("[T]here was no constitutional violation because [defendant] knowingly and intelligently

waived her right to counsel, unequivocally asserted her right to self-representation, made a

conscious strategic choice to waive her right to be present in the courtroom as part of a *de facto*

political protest defense, and was afforded the opportunity to return whenever she chose.").

Because, as the Third and Second Circuits have held, there is no Supreme Court authority

mandating that a defendant's Sixth Amendment rights are violated when a trial court conducts a

trial after a *pro se* defendant voluntarily waives his right to be present, it cannot be said that the state courts' rejection of Bradley's claim either contravenes or unreasonably applies federal law. Bradley therefore cannot prevail on this ground.

E.      Evidentiary Hearing

Bradley further requests an evidentiary hearing as to all claims.  A district court may not hold an evidentiary hearing on a claim for which a petitioner failed to develop a factual basis in state court unless the petitioner shows that: (1) the claim relies either on (a) a new rule of constitutional law that the Supreme Court has made retroactive to cases on collateral review, or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence, and (2) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found the petitioner guilty of the underlying offense.  28 U.S.C. § 2254(e)(2).  Where the failure to develop the factual basis for the claim in the state court proceedings is not attributable to the petitioner, to receive an evidentiary hearing, the petitioner must make a colorable claim for relief and meet one of the factors set forth in *Townsend v. Sain*, 372 U.S. 293 (1963).  *Insyxiengmay v. Morgan*, 403 F.3d 657, 670-71 (9th Cir. 2005).  In *Townsend*, the Supreme Court concluded that a federal habeas petitioner is entitled to an evidentiary hearing on his factual allegations if: (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did

not afford the habeas applicant a full and fair fact hearing.  *Id.* at 670 (quoting *Townsend*, 372

U.S. at 313), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).

As discussed above, Bradley has failed to assert a colorable claim for relief as to any of

his claims.  Because Bradley does not cite to new laws or underlying facts that were not

developed on the record before the state courts with respect to those claims, he has failed to

satisfy his burden of proof under 28 U.S.C. § 2254(e)(2).  Accordingly, Bradley's request for an

evidentiary hearing must also be denied.

## V. CONCLUSION AND ORDER

Bradley is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ

of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the request for an evidentiary hearing is

**DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain

a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree

with the district court's resolution of his constitutional claims or that jurists could conclude the

issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

25

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the

Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: September 14, 2015.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge